Our first case on today's docket is the case of This Day Forward Ministries v. City of So who is the appellant here? Oh, okay. And you'd like to move forward a little bit, certainly, Mr. Blyer. You had me confused there. I thought you were going to jump in first. So you may proceed when you're prepared to, and everybody's settled? You may be in better shape than me. My wife tells me it's not a matter of I can't hear, I just don't listen. And that starts really early. I'm going to refer to my client simply as TDF during these arguments. This case involved a suit for declaratory judgment, breach of contract and fraud against the City of Marion. And the facts are laid out in our brief, but I think it is important for me to go over the sequence of events that occurred that brought us here. Back in February of 2005, the parties entered into a contract for the sale of the old Marion Memorial Hospital. And that was Plaintiff's Exhibit 1 in the trial. The contract clearly states in Section 1 that the property is the Marion Memorial Hospital located at 917 West Main Street, Marion, Illinois. It is legally described in Exhibit A, included are all permanent fixtures, all the property that belongs to or is part of the real estate, etc., etc., etc. So this was a fairly comprehensive contract that sold real estate, buildings, improvements, fixtures, everything. In addition, there was a standstill clause in Section 8 of that contract that states sellers shall not initiate or carry on negotiations for the sale of the real estate with any party other than the buyer. So this locked them into negotiations strictly with my client. After that, the City entered into a contract, the City, and this is all in the record as testimony, the City began violating the standstill clause and negotiating with people on their own. This caused the President of TDF to go file liens against the property at the courthouse. Then comes a buyer by the name of Matthew Stover that approaches my client. They are trying to negotiate with the City, but there's some terms in there that the City wants with Mr. Stover that concerns the President of TDF, that they're concerned about this might have been bank fraud and part of this. So the City decides it wants to contract with Mr. Stover themselves. The problem is the standstill clause prevented them from doing that. So then they enter into what is called a settlement agreement, which is the preface of this case. It's what the interpretation needs to be made, what the court interpreted, to get us here. The settlement agreement clearly states that this day forward, and Marion had previously entered into various contracts concerning the sale of the Marion Memorial Hospital by Marion to this day forward, so it clearly referenced the prior contract. It mentions the Marion Memorial Hospital five times in this one-page settlement agreement. So this wasn't just a sale of real estate, it was a sale of the hospital. The City, after, and what this settlement agreement does is it releases the prior contract. It releases the parties of all claims against each other except for the terms stated in the settlement agreement. Once this is completed, the City is free to contract with Mr. Stover. They enter into negotiations, and the deal falls through, and the City is never able to close the sale with Mr. Stover. Then the City starts selling off parcels of the real estate. Then they tear down the hospital, demolish it, and haul it off. And then the City refuses to pay under the terms of the settlement agreement. That's what brought us to court. Section 4 of this settlement agreement is the whole issue in this case. It is what the court had to determine at the trial level. It states, Marion shall pay $225,000 to this day forward at the closing of the sale of the Marion Memorial Hospital and upon receipt of payment. This day forward shall release any and all liens or other claims against the property. This payment, and this is the crucial sentence, this payment shall also be due from any transaction in which Marion disposes of the property, buildings, and or any insurance proceeds received by Marion from a fire or other casualty in the Marion Memorial Hospital. That is what the court had to interpret. I think clearly that last portion of the second sentence where it talks about the insurance proceeds received by Marion from a fire or other casualty in the Marion Memorial Hospital tells the intent of this document. Obviously if we had an earthquake and it knocked this building down and the City were to collect insurance, they had to pay. The hospital was an integral part of this transaction. What the trial court has stated was that it didn't matter that the City tore the hospital down at all. It doesn't matter if the City started selling off this parcel of ground because they broke it up. Mr. Sanders, is there a contention that the hospital building itself was not an asset or was in such disrepair that it had no value? No. There's no argument to that effect made in the trial court at any point. Do we know at all why the City tore it down? They were having so much trouble selling it and the cost of maintaining it was so high they felt like the best way to get rid of it was to simply tear it down and subdivide the property because this was 7.448 acres in the middle of town. So they chose to demolish the building, tear it down, and subdivide the property. So far, at least at the end of this trial, a little less than half of the land had been sold off, but it was in two separate parcels. One went to a church and the other one went to a friend's discount store. So the issue was they had broken this parcel up. The court said that the property as meant in the contract was the entire 7.448 acres. I totally agree with you. Now, it's your argument that that included all the property in the contract or just the part that the hospital was on? No, the entire 7.448 acres because the original sales contract contained a property description that entailed the entire 7.448 acres as part of the hospital. It was one parcel to begin with. So they were selling the approved and sitting on this one parcel. And what the court has stated is that the city does not owe the money, despite the fact they're breaking it up, the city won't owe the money until they have sold off the last square inch of this property. So it doesn't matter how much of it they sell off until they sell the last square inch, the trigger doesn't occur. They've ignored the fact that the hospital was torn down. But it makes no sense to say if an earthquake destroyed the hospital and they collected insurance, the city would have to pay. But if the city voluntarily tears the hospital down, they don't. Clearly, the hospital was an integral part of this contract, and it was part of the integrity of the real estate as a whole. And our position is that under the law, all real estate is considered to be unique. You cannot say this parcel is equal to this parcel. They are all separate and distinct. So when the court ruled, and I agree with the court's ruling, that the term property that's retained in the settlement agreement means the entire 7.448-acre parcel, the trigger didn't occur the moment they sell off the last square inch. The trigger occurred the moment they sold off the first square inch. I guess they might never sell off the last square inch. There might even be a disincentive to do that. Oh, absolutely, there's going to be a disincentive for them to do that. That's the way they can get around, according to that court's ruling, get around ever paying this money. But the reality is the integrity of that property, as described by the court, the 7.448 acres, it doesn't exist anymore. That parcel as a single parcel has been disposed of the moment they sold the first square foot of that land. So you can no longer buy that 7.448-acre parcel from the city. It doesn't exist anymore. It's now something like 3.8 acres is all that's left. So the thing that makes it problematic for this court is to affirm the trial court's decision. As somebody that practices probably 75% real estate law, the number of doors that will be opened by an affirmation of that ruling, it's just mind-boggling. Because it means that if I decide that I've got a contract with somebody and I've got two lots set side-by-side, and I decide I want to breach that, and I'm going to sell one of those lots, all I've got to do is survey off one inch of one side of that and sell the rest of the lot off and say, well, I'm not going to breach because I've still got part of that lot left. It's like putting a car, a sign on a car light, saying I will pay you when I sell the car, but I go sell the car, but I keep one left nut of it, and say, well, I haven't sold the whole car yet, so I really don't have to pay you. That, in essence, is what has happened here. The city has taken away the building. It's taken away over half a land, but says we don't owe you the money. That clause says the payment shall also be due from any transaction in which Marion disposes of the property, buildings, and or any insurance proceeds, et cetera, et cetera. Our position is the moment the city disposed of any of the property, any of the real estate, it was a trigger. The moment it disposed of any of the buildings, it was a trigger. Because of the and or language in there, any one of those items or any combination of those items would have triggered the payment. The mayor testified on the witness stand that there was never a transaction. He admitted that, well, yes, they did hire a contractor, and they paid the contractor, and he tore the buildings down, and he hauled the buildings off, but that wasn't really a transaction, and it wasn't disposing of the buildings. He said disposing of the buildings and demolishing the buildings are two different things. Well, technically it may be true. You can demolish the building and it's still sitting there, which is why I asked the question that visibly irritated him, well, do you have the rubble stored somewhere? Because certainly an argument might be able to be made that if you tore it down and hauled the rubble off and put it in a warehouse, maybe you haven't disposed of it, then, bam, it's been hauled off in the dump. His position was there wasn't a transaction because a transaction only occurs when somebody pays money to the city. If the city pays money to somebody else, that's not a transaction. So although both parties agree that there's no ambiguity, we seem to be coming up with different interpretations of the contract, and ambiguity is a legal question. This court can address it despite the fact that the parties say there is no ambiguity, but the problem with the ambiguity question is you have to have two reasonable interpretations. To say that a transaction hasn't occurred because it only occurs when I'm paid money, that's not reasonable. To say that tearing a building down and hauling it off in the dump is not disposing of it is not reasonable. So our position is there's no ambiguity to this whatsoever when read in the context both of the settlement agreement and the sale contract that it was designed to replace. I don't think there's any ambiguity just reading this one-page settlement agreement at all, but that's why we have lawyers that are on opposite sides. The other issue, and this is only dealing with really the breach count that's in the lawsuit. There is a fraud count that the court dismissed that we have filed claiming the city intentionally misrepresented the situation when they entered into the settlement agreement. There's no dispute that the parties had negotiations prior to the settlement agreement being signed. There's no dispute that the president of TDF signed it. No dispute that Mayor Butler signed it. There's no dispute that the city council approved this contract. However, the mayor did state both in the witness stand and in the affidavit for a summary judgment motion that at no time did the city ever have any intentions of paying this plaintiff unless the city was paid $1,235,000 by Matthew Stoker. He tied the payment of a specific amount of money by a specific person saying flat out the city would never have paid her unless that occurred. The interesting thing is there's no amount in the settlement agreement that has to be paid to the city. There's no mention of Mr. Stoker's name anywhere in this settlement agreement. There's nothing indicating that Mr. Stoker was connected to this in any way whatsoever. In fact, the contracts that the city had with Mr. Stoker, which the city attorney drafted, clearly had a clause in it that said, a third-party clause, saying no one else has any interest whatsoever in this contract. And the city signed that, and the council approved that. So for them to come back later and say, well, this is tied to this contract, totally violates the terms that the city agreed to with Mr. Stoker that the city attorney drafted. And Judge Eekes got that part of it right. He said these contracts are not tied together in any form or fashion. It doesn't matter how much the city's paid for this property. There's no monetary link whatsoever. He got that much of it right. Our only issue with the trial judge was the fact that he said you don't have to pay until you sell off the last square inch of this property. We think that's just a, it doesn't follow on. But the fraud count is what we also have, like I said, some issues with. The city or the mayor, the mayor was the only one to testify. And he clearly said that he had no intentions of paying this unless he sold it to Stoker. Never had any intentions of paying it unless he sold it to Stoker. The evidence that the mayor violated, that he would sign agreements and then violate them, go back all the way to the fact that he signed the contract that had the stamp still clause and almost immediately started negotiating with other parties. The representations that he would make, both in writing and verbally, seemed to mean nothing to me. I realize I've been mayor for 50 years, but that's not a license to do anything you want. The problem was here he needed this settlement agreement in order to get rid of the original contract so they could contract with Stoker. So there was a huge motive there to say and sign anything they needed to do to get rid of that original contract. Was there any litigation involved or filed that precipitated this settlement? No. This was all done voluntarily between the parties. And that was, that's why there's a fraud count in there because it's what was said to them, what was represented to TDF in order to induce them to sign the settlement agreement which signed away their rights under the original contract and therefore eliminated the stamp. This freed up the city to sell this property to anybody they wanted to. The liens that TDF had filed were for $450,000. And the contract, the settlement agreement, agreed to cut that amount in half. So the city got some huge benefits from this settlement agreement. The thing that is telltale is about five, I don't know if it was five or eight days, after the council approved the settlement agreement, then the mayor comes back and submits a proposed change to the settlement agreement to TDF. And those proposed changes then would tie it to Stoker, tie it to specific amounts. He wanted to put in all the things he wanted from the beginning. And he said, well, these were revisions to the contract. They were pretty massive. And the president of TDF said, that wasn't our agreement. We're not doing that. The mayor says, well, fine, but that's the terms, and that was largely their basis for not paying them. They said, well, this was really the terms in the first place. Despite the fact that we signed a contract that said something totally different. Now, the question is, is there anything confusing in the settlement agreement? Not really. It's one page long. As a matter of fact, it's probably the actual terms are less than half a page. According to the mayor's testimony, the city council had this document. It was given to them prior to the meeting. They had it for about an hour. They sat in an executive session and discussed it. And then came out and all four voted to approve it. I mean, I don't know how anybody can interpret this any other way. If they knew what was in it, and they had no intention, and the mayor didn't say it was just, he didn't have any intention. He said the city never had any intentions of paying this unless it went through Stover. If they entered into that contract knowing that there were additional terms that they wanted that weren't in that settlement agreement, that is fraud. It means that you don't have the intent to carry through with what you agreed to do when you entered into the agreement. So we're asking this court to overturn the decision. It was a directed verdict on the fraud count. We're asking the court to reinstitute that and make the finding that based on this testimony, there was fraud. But more importantly, the one we're really interested in is simply the breach of contract. We think the triggers have occurred, and that the city owes TDF $225,000. If we can get that, we can get pretty happy, because that's all that was ever expected in the first place. Thank you. Thank you, Mr. Sanders. You'll have the opportunity for a rebuttal. Mr. Flyer. Please report. I've listened to the argument. I think one time I came here 15 or 20 years ago on Justice Rarey. We had a case, and I said, Your Honor, we've got a case here that I'm going to give you a fastball right down the middle. Be easy to understand. He said, You know, we can handle that. So that'd be great. But he said, You know, Mr. Flyer, we're used to having curves and change-ups and drops and everything else. So we can handle any kind of thing they throw at us. So in this case, it seems to me the plaintiff is trying to throw a curve. Before, I think the touchstone of my entire argument, and this is a Rule 23 order, which I don't cite for the opinion from the standpoint of rule of law, but for the court's statement with regard to how you look at these kinds of cases. And, Justice Chapman, you wrote the opinion. The case is Young v. Riemann. And I want to read, On appeal from a bench trial case, we will not disturb that judgment unless the trial court's judgment is clearly contrary to the manifest way of the evidence. The trial court's judgment is given deference because the trial judge was able to assess each witness's credibility. A judgment is contrary to the manifest way of the evidence if a conclusion opposite to that reached by the trial judge is clearly evident. You cite cases, and that is general principle of law in a bench trial. And I think that's appropriate in this case. Now, a few points, though. I guess I could start from the back and go front, but I want to talk about the contract. Mr. Sanders points out that the contract, the alleged contract, and Judge Higgins found there was a valid contract. We disagree with the fact that he said that it was not tied with the sale of Mr. Stover because if you look at the minutes that are cited in my brief, they were done simultaneously. They would sell the hospital to Matthew Stover for $1.325 million, and his contract says he pays $225. In order to make it come out right, this counsel passed the resolution that they would pay, they sale the hospital to Matthew Stover, and they would pay this day forward ministries $225,000. Now, $225,000 is not like, say, $100,000. It's obviously taken some thinking to come up with that figure, and that's in the contract with Matthew Stover, which was approved at the same meeting that the contract with this day forward to pay him $225,000. But beyond that, looking at the agreement itself, and incidentally, this Mr. Sanders says we brought her a contract. The fact is the contract was provided, the form which they are founding her case, was Attorney John Brewster, who was their attorney. They brought it to the counsel. They drew the contract, or one of the five points. The court finds, and I think it's just form book law, that all inferences are construed against the drafter of the instrument. If there's any ambiguity, they're construed against the drafter. In this case, we're here arguing because there's an ambiguity. So it's just false because the case I cite, Supreme Court case, is that any ambiguity in the contract is you're found against the drafter of the agreement. Now, there's no question. They brought the agreement to the counsel. That might well be 10 minutes before the counsel met on that particular August 1st. It was drafted by John Brewster. But look at the agreement. Your Honor, every time anything was mentioned about the property, it was stated the 7.44 acres. Every time. Every time property was used in anywhere in this case, they deferred to 7.44, which was the hospital. What about, Mr. Blighter, the contention, though, that if it's being sold piecemeal, there's kind of an incentive for the city to not sell the last little bit? Well, Your Honor, you're correct. But the idea, this contract, you look at it, it was for the sale of the hospital. Now, if it didn't, and it also says there to be paid from any transaction, which disposes of the property, the building, or insurance. Now, the insurance is no insurance. But how can you make a payment from a transaction from which you receive no money? When it comes to the transaction of tearing down the buildings, they talk, well, you tore down the buildings. It's our position that there was nothing, no transaction from which they should be paid the $225,000. Now, if we would have sold the hospital to Matthew Stover, if we would have sold it to just about anybody, we wouldn't be here today. So you're saying, and that's why I asked what value the hospital had, if the main value of the property was the real estate, it's your contention that that would not have prohibited you from destroying the real estate and devaluing the property overall? Well, it's our position that there to be paid $225,000 when the property is sold. Now, you'll point out, maybe they can hold a piece of that may be true. But they drafted the agreement. They could have said they'd sell any part of the property. That wasn't what it said. They said sell the property. And they drafted it. We didn't draft it. They drafted it. And if there's an ambiguity, it's construed against them. So the property is not. Now, Judge Epus ruled that when the property is sold, they get paid. But only when the property is sold. And that's throughout this thing. And that's the whole idea. And that's our position. Now, how many acres did they sell? How many acres did they sell? It was 7 1⁄4 acres? Yes. How much was sold? They sold to the Zion Church. Right. I don't know exactly. A parking lot, an acre or something like that. Then subsequent to that, they sold a piece to Fred's Discount Store. If you've ever been to Marion, you've seen it there. And they sold three or four acres. I don't know. They still own more than, I think, without being a surveyor, we still own more than half of the property. Okay. And the purchase price for these pieces, the Zion Church, I believe they paid $50,000. And Fred's paid maybe $90,000. None of them. We've not received $225,000. Now, we may eventually. And if the property is sold, as what Judge Epus said, that's fine. Once it's sold. But there's nothing that has happened at this point in view of the contract they drafted, their own contract they drafted, which would obligate the city of Marion. When you cut through the chase, this whole idea was to sell the hospital. When this agreement was reached, the hospital was standing. You know, I have a lot of longstanding. My children were born in that hospital. I mean, I've had a longstanding. That's a beautiful hospital. They built them on the outside of town. The city got the hospital. The city tried to sell that hospital time after time. But finally they couldn't sell it. And they just couldn't. Keeping it up, the maintenance, safeguards and all that, it became too much. So they tore it down. Now, obviously, when this agreement, a so-called agreement, was entered in August 1st, 2005, the hospital was standing. I mean, it was standing. And the idea was to sell the hospital. And if we sold the hospital, we'd pay them the money. Now, we had prices you wouldn't believe. They had one at $3.8 million. The state forwarded an offer at $2.8 million. We had $1 million. We had all kinds of offers. But nobody ever came up with the money. And the state forwarded never came up with the money. They had a contract in February to buy the hospital, but we didn't see any green. They didn't come forward on it. If they had come forward to it, we'd have had another. So the whole thing, this whole thing was to sell the hospital. And it did not happen. Now, with regard to the fraud count, I don't see how if they drew the agreement and brought it to us, and the agreement, if the court determines it's valid, where's the fraud? I mean, they get what the agreement provides. They're agreeing. There's no fraud. I might add this parenthetically, that the mayor, what he says is not necessarily what's going to happen. The mayor can't pay him a quarter. He can't do anything. The council has to do it. And all that's foreign book law. But the mayor's not sued. Now, what he does or doesn't do is not a moment in this case with regard to the fraud, because the city council would have to act on anything of that nature. But I say it's a duplication because there's no such thing as fraud when the very thing they're asking is what the fraud would give. I mean, they say we've misrepresented the contract. We're going to pay. Well, if the court determines, if Judge Iggs determined the contract was valid, there's no way of fraud. And he did agree it was valid. But nothing has happened to trigger it. So if it is triggered, they get paid. There's no fraud. Now, with the contract, the same thing. So what you've got here, you've got a situation where there's agreement to sell the hospital. I mean, when you boil it down, we have a different spin on it. We think it should have been selling to Matthew Stover. But that's beside the point. Judge Iggs didn't agree with it. We didn't appeal that. But we did. I'm sorry. I missed what you just said. You had an understanding, and you thought it was the selling of what? You look at my brief. You see that at the time the council approved this agreement, they also approved the sale of the hospital to Matthew Stover. Okay, Stover. Same day, within two minutes of each other. But the controls, they were separate. I mean, no question about it. And Matthew Stover's contract is in there. And the city, this day forward, is to get $225,000. Now, what happened or didn't happen, I wasn't there. But you can see, you can glean through this, that the whole idea, Matthew Stover pays the city 1.325. He pays the city. They pay it, and this day forward, ministry gets $225,000. That's simple. Nothing has happened beyond that that would obligate the city. The hospital was never sold. There was no transaction from which a payment could be made. There was no insurance proceeds. The property is still there. The entire property has not been disposed of. The property has not been disposed of. And as the old saying, they drew the dirty pictures. They drew the contract. They could have put anything they wanted to in there, I guess, depending on how it was paid. They could have said sale of any portion of the property, the tearing down of the buildings. They could have put anything in there. You know, maybe it wasn't contemplated at the time, but that's not our fault. What happened, happened. But the contract upon which they're seeking to proceed did not obligate the city of Marion because the hospital was never sold. The property has never been sold. There was no transaction from which a payment can be made. The building, you know, theoretically, they could have sold those buildings and leased the property. That would have been possible. We'd owe them if we'd sold the building, but we didn't do that. So, you know, I think the contract action, as I mentioned, that's the fraud in the contract. I think the meat of this has to do with your interpretation, and I suggest that Judge Ickes, he listened to everything. And I realize that, generally speaking, the construction of it is a matter of law. But basically, you have to take it in the context of everything, the totality of the circumstances. As Your Honor pointed out in the Young case, the trial court sees what happened, has a record, everything, knows better than anybody what should be happening. And they ruled in this case, and they ruled. You might say they didn't rule for the city of Marion. In fact, they ruled against the city of Marion. But we're arguing that the ruling they made is such that we will abide by it. And if we sell the property, we'll pay them. And if we sold the building, we would pay them. But nothing has happened that would contemplate a situation which would obligate us. And as I say, this contract was prepared by them. If there's any ambiguity, if the issue is resolved in favor of the party not drafting the contract, and it's our opinion that Judge Ickes heard everything, and his ruling is such that the fraud count, the contract count, and his interpretation of the sales agreement is reasonable. Thank you very much. Thank you, Mr. Bly. Mr. Sanders, rebuttal. What do you say when counsel said you actually won that case? Well, up to a point. They were taking a position that there was no value to the contract at all to be enforced. So basically what the court said is, yeah, you've got an active contract, and one day they may owe you $225,000, which went against what they were claiming. But then the way the court ruled, we may never be actually owed the $225,000 because as long as they hold on to a postage stamp-sized piece of real estate, they don't have to pay the money. So, yeah, you win part of it and you lose part of it. So it's kind of a strange win. I don't know if it's a win for either one of us. I don't really know how to respond to the Young case because it's not in Mr. Blyer's brief. I'm aware of that, but he could have cited any number of cases. Right. I just want to point that out. I can't respond to it for that reason. I'm aware of that. So keep that in mind. Mr. Blyer also, I think, stated that we're here because there's an ambiguity, which I found interesting. Because on page 4 of his brief, he says the defendant contends there is no ambiguity. Later in the brief, he says again, any ambiguity, and the defendant contends there is no ambiguity. So the arguments seem to change kind of like the terms of the contract change. He says that if we sell the property, we will pay. That's not what Judge Ickes ruled. In fact, Judge Ickes said if they simply transfer that property to another government entity, they have to pay. So it has to do with moving this property around, not whether or not they actually receive any money. It was interesting in the trial because I asked, it's on page 25 of my brief, I asked the mayor, let's hypothetically say that Mr. Stover comes back in the picture and buys the remainder of the property for $100,000. Would you owe the money to him? I don't know. I'm not willing to speculate about that. So is there any set of events you can think of at this point that would absolutely kick in? Well, sure. If we were to sell the property for $500,000, we would owe her $225,000. So now it's no longer $1,235,000. If they get $500,000, they're going to owe her. He didn't say it with paper. He said they would owe her. And I realize the distinctions the mayor is making, that may not mean a lot. Well, the mayor is not a lawyer, though, either. But he used to be. Mr. Blair, the whole idea was to sell the hospital. That's close. I would say the main idea was to hopefully sell the hospital. That is indicated by the language in the contract that clearly makes it they have to pay this if they sell the hospital. That is the first sentence of the paragraph. For Marion, she'll pay $225,000 for this day forward at the closing of the sale of Marion Memorial Hospital and upon receipt of payment. That is one sentence in this agreement. This entire agreement, and I counted them while I was sitting here, is eight sentences long. That's all there is. And that's one sentence. So if that was the true intent, why not leave it at that? But what they did is one of those other eight, seven sentences says, This payment shall also be due from any transaction in which they dispose of the building or property. Clearly, they went far beyond the concept that this hospital has to be sold in order to take the payment. So, really, the two sentences that you have to look at is two out of eight. One-fourth of the contract is all that really matters. But this second sentence, and Judge Akers honed in on that. He said that's the crucial one. He said we understand if they sold it, they'd owe us money. Nobody's disputing that. But what does that second sentence mean? Well, clearly, like I said, insurance proceeds from the cash. That goes far beyond selling the hospital. In fact, in that instance, if the building had been destroyed, it wouldn't matter if the city owned all the property. They'd still have to pay the money. So this didn't even have anything to do with transfer. It had to do with the integrity of the property as a whole, which included buildings and real estate. The moment you took away any portion of that land, tore those buildings down, the trigger occurs, and the money's out. And that's what we're asking the court for as a judgment, saying I might as well owe $225,000 now. All right, thank you. Thank you, Mr. Sanders. Mr. Blyer, for your briefs and arguments. We'll take them now.